IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:25-cv-0563

| | |
|---|---|
| JI LI, | ) |
| Plaintiff, | ) |
| v. | ) **COMPLAINT** |
| | ) **(JURY TRIAL DEMANDED)** |
| HONEYWELL INTERNATIONAL, INC. | ) |
| Defendant. | ) |

JI LI, complains and alleges as follows:

## I.
## NATURE OF THE CASE

1. This civil action arises from violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 (hereinafter referred to as "ADEA"), 42 U.S.C. § 1981 ("Section 1981"), and state law. Plaintiff, Ms. Ji "Liz" Li (hereinafter referred to as "Plaintiff" or "Ms. Li"), alleges that the Defendant, Honeywell International, Inc. (hereinafter referred to as "Defendant") subjected her to disparate treatment, terminated her employment, and denied her severance wages solely because of her age in violation of ADEA, Section 1981, and the state public policies set forth in N.C. Gen. Stat. §143-422.2. In filing this action, Ms. Li seeks appropriate equitable and monetary relief in the form of present and future lost wages and benefits, compensatory damages for emotional distress, attorney fees, and liquidated and punitive damages as provided by federal and state law.

2. Plaintiff Ms. Li, a 55-year-old U.S. citizen, was wrongfully terminated from her position as Vice President and General Counsel for the Defendant, Honeywell International, Inc. and Defendant's China subsidiary, Honeywell (China) Co. Ltd. ("Honeywell China"), *solely because she turned 55 years old* and was working in China. Rather than abiding by U.S. law as it is required to

1

do, Defendant illegally subjected Ms. Li to China's mandatory retirement age of 55—a mandate that even China does not apply to foreign workers.

3. Two clauses in Ms. Li's employment contract blatantly violate the ADEA. Section 8 Article 10 and Section 8 Article 1(b) permit Ms. Li's termination upon reaching China's retirement age, supposedly pursuant to applicable Chinese law. In September and October 2024, Defendant claimed to rely on these clauses and Chinese law to terminate Ms. Li on her 55th birthday, even though the People's Republic of China ("PRC") does not apply its mandatory retirement age to foreign workers and despite Ms. Li's ADEA protections.

4. Second, Defendant relied on Section C Article 6(b) of her offer letter to deprive Ms. Li of her executive severance package (an employment benefit), as it treated Ms. Li's attainment of age 55 as "Cause" for termination. Nothing in the laws of the PRC—or Shanghai, where Ms. Li worked—mandate that Ms. Li be denied her severance package because she reached the age of 55. This denial of severance therefore blatantly violates the ADEA, which prohibits discrimination in the terms and conditions of employment.

5. As a result of her unlawful termination and deprival of owed severance wages, Ms. Li suffered significant economic harm.

## II.
## PARTIES

6. Plaintiff is an American citizen. On May 27, 2019, she was hired by Defendant's China subsidiary as Vice President and General Counsel for Honeywell's Aerospace Division in the APAC region. Plaintiff later served as a Vice President and General Counsel for the APAC region for both Honeywell's Aerospace Division and Honeywell's corporate operations. Plaintiff lived and worked in Shanghai, China until her termination on October 10, 2024. She currently resides in Shanghai.

7. Defendant Honeywell International, Inc. is a Delaware corporation headquartered in North Carolina. Honeywell (China) Co. Ltd. is a wholly owned subsidiary of Honeywell International, Inc. located in Shanghai, China. At all relevant times, Honeywell International, Inc.

and Honeywell (China) Co. Ltd. operated as a single, integrated enterprise with respect to Plaintiff's employment. Honeywell International, Inc. exercised centralized control over Plaintiff's hiring, compensation, supervision, and termination, and is an employer within the meaning of 29 U.S.C. §630(b). The two entities shared common management, interrelated business functions, and unified control of personnel policies and decisions, as set forth more fully below:

   a. *Common Management*—U.S. top executives of Defendant's Aerospace Division interviewed Plaintiff and approved Plaintiff's 2019 hiring. Her supervisors Victor Miller and Su Ping Lu issued offer letters to Plaintiff in 2019 and 2023, respectively. Harriet Mountcastle-Walsh later replaced Miller as the General Counsel for Defendant's Aerospace Division and was Plaintiff's supervisor. All of these individuals are/were employees of Defendant based in the United States and exercised direct supervisory authority over Plaintiff's work in the Asia-Pacific region, including evaluating Plaintiff's performance in U.S. human resources systems following Defendant's processes and policies. In addition, many of the executives overseeing Plaintiff and other APAC operations simultaneously held senior leadership roles at Honeywell International, Inc. This confirms that key APAC decisions were made at the global level by Defendant's U.S.-based corporate leadership.

   b. *Centralized HR & Compensation* — Plaintiff's executive compensation—including stock and cash incentives—was determined and issued under Defendant's 2016 Stock Incentive Plan, which is governed by U.S. laws and administered in the United States. Plaintiff was covered by Defendant's excess liability insurance policy administered in the United States. Plaintiff's employment (hiring, performance review, bonus grants, etc.) was governed by uniform processes and policies controlled by Defendant's U.S. human resources teams. Most critically, the October 2024 directive to terminate Plaintiff's employment at age 55 was ratified and approved by Defendant's U.S.-based supervisor and Human Resources leaders, who had ultimate authority over her employment status.

3

c. *Functional Interrelation* — Plaintiff's main job function was to support Defendant's compliance programs to fulfill Defendant's U.S. DOJ deferred prosecution obligations. Defendant's U.S. executives drafted and approved an announcement expanding Plaintiff's remit to further enhance Defendant's compliance program in Asia-Pacific region; drafts reside on Defendant's U.S. email servers. Defendant's U.S. executive office sponsored and funded a 2023 Executive Development Program and selected Plaintiff to join.

d. *Common Financial Control* — Defendant wholly owns Honeywell China and consolidates its results in SEC filings.

8. Ms. Li's work directly benefited Honeywell International, Inc. and supported the integrated enterprise relationship between the parent company and its Chinese subsidiary. Ms. Li's primary function was to support Honeywell's compliance programs to fulfill critical U.S. legal obligations, including Honeywell's Deferred Prosecution Agreement with the U.S. Department of Justice for FCPA violations and its consent agreement with the U.S. Department of State's Directorate of Defense Trade Controls ("DDTC"). Her leadership of the China Steering Committee was specifically designed to satisfy DOJ requirements for improving compliance culture in China as part of Honeywell's commitment to U.S. regulators.

9. Ms. Li regularly reported to Defendant's U.S. executive leadership, including the General Counsel, Chief Financial Officer, Chief Compliance Officer, and Chief Auditor, providing quarterly briefings on compliance initiatives that directly supported Honeywell's obligations to U.S. authorities. Additionally, as APAC General Counsel for Honeywell's Aerospace Division, Ms. Li was responsible for drafting, reviewing, and approving sales contracts and business transactions that generated billions of U.S. dollars in revenue for Honeywell International, Inc. Her work ensured that Honeywell's APAC operations remained compliant with U.S. export control regulations and other legal requirements, thereby protecting Honeywell's ability to conduct business globally while maintaining its licenses and regulatory standing with U.S. authorities. This substantial contribution to Honeywell's U.S. compliance obligations and revenue generation demonstrates the integrated

nature of the enterprise and Ms. Li's critical role in supporting Honeywell International, Inc.'s core business interests.

### III.
### VENUE AND JURISDICTION

10. Venue is proper in this Court. Pursuant to 28 U.S. Code § 1391(b), Defendant Honeywell International, Inc. was and continues to be a Delaware corporation, authorized to conduct and is conducting business within the State of North Carolina. Defendant maintains its corporate headquarters in Charlotte, North Carolina, and is therefore a resident of this judicial district.

11. Venue is also proper in this Court under 28 U.S. Code § 1391(b) because a substantial part of the unlawful employment decisions and events giving rise to these claims occurred in this judicial district.

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) to adjudicate this civil case, in which the total amount in controversy, exclusive of interest and costs, exceeds $75,000.

13. This Court has jurisdiction to adjudicate Plaintiff's claims under the Age Discrimination in Employment Act, pursuant to 29 U.S.C. § 621 et seq.

14. This Court has personal jurisdiction over Defendant Honeywell International, Inc. because its principal place of business is Charlotte, North Carolina; it is thereby "at home" in the state.

15. All procedural prerequisites to the institution of this action have been fulfilled.

### IV.
### FACTUAL ALLEGATIONS

**A.    Ji Li was a Successful Employee at Honeywell.**

16. On May 27, 2019, Ms. Li signed an employment contract with Honeywell International, Inc. to work as Vice President and General Counsel for the APAC region for Honeywell's Aerospace Division.

17. Ms. Li's first employment contract ran from May 27, 2019, until May 26, 2022. The contract provided for a $358,676 per year base salary, and an annual total compensation of $798,866

that included bonus, cash allowance, and long-term incentives, which vested annually over four years for stock options and vested over three years for Restricted Stock Units and Performance Cash Units. Her contractual severance benefit equaled nine months salary.

18. On January 11, 2022, Plaintiff and Defendant entered into a new contract, running from January 1, 2022, until December 31, 2024. The contract provided for a $364,230 base salary, and an annual total compensation of $862,226 that included bonus, cash allowance, and long-term incentives. Her severance benefit amount remained nine months salary.

19. In order to work as a foreigner in China, Ms. Li held China's Class A work permit with expiration dates that matched those of her employment contracts, in accordance with China's Rules for the Administration of Employment of Foreigners in China. The work permit dates were May 27, 2019, until May 26, 2022, and May 27, 2022, until December 31, 2024. Pursuant to China's regulation, Notice of the State Administration of Foreign Experts Affairs on Issuing the Service Guide to the Foreigner's Work Permit in China (for Trial Implementation), Class A work permit holders are not subject to any age restrictions.

20. Following years of her undisputed strong performance, on January 12, 2023, Ms. Li was offered and accepted a promotion to Vice President and General Counsel, a regional corporate role rather than one limited to the Aerospace Division. In the new role, she reported to Honeywell General Counsel for International, Su Ping Lu. She covered both corporate and aerospace legal work, focusing largely on cleaning up Honeywell's China compliance in accordance with the company's Deferred Prosecution Agreement with the U.S. Department of Justice.

21. Ms. Li's work directly supported and benefited Honeywell's critical compliance obligations in multiple areas. First, as Vice President and General Counsel for the APAC region of Defendant's Aerospace Division, Ms. Li supported Honeywell's obligations under its consent agreement with the U.S. DDTC. She provided comprehensive export compliance training to regional employees, accompanied Honeywell's Chief Compliance Officer and Special Compliance Officer on site visits to Honeywell China facilities, and interviewed Honeywell China employees to ensure compliance with U.S. export control regulations. Her exemplary work in this capacity

contributed to Honeywell's successful exit from the three-year consent agreement in April 2024.

22. Additionally, Ms. Li was responsible for drafting, reviewing, and approving sales contracts and other business transactions that generated billions of U.S. dollars in revenue for Honeywell. Her dual role as both Corporate General Counsel and Aerospace Division General Counsel for the APAC region demonstrated her exceptional capabilities and the trust Honeywell placed in her leadership, making her termination particularly egregious given her substantial contributions to the company's compliance and business success.

23. According to her supervisors and as reflected in her work product, Ms. Li was a phenomenal executive employee. In fact, in September 2024, she was told that her role would be expanding from a focus primarily on China to all of Asia, specifically those countries outside of China where business practices are irregular. This was a significant initiative that would be announced publicly alongside a long trip to meet with business leaders across Asia to discuss the initiative and Ms. Li's leadership.

24. Plaintiff made preparations for this increase in scope and responsibility alongside her supervisor, all with the intent that her employment contract would be renewed on or before December 31, 2024. Based on Ms. Li's excellent performance, previous promotion, and newly announced initiative under her leadership, her contract would, in the ordinary course, be renewed for another term following expiration on December 31, 2024.

      **B.    Ms. Li Was Fired Solely Because of Her Age.**

25. Amid Ms. Li's preparations for the new initiative, on September 30, 2024, Honeywell China's Human Resources department called Ms. Li to inform her for the first time that her existing contract would terminate on her 55th birthday—in just nine days, on October 10, 2024. This was purportedly due to China's "mandatory" retirement age of 55. Ms. Li was shocked.

26. During this call and subsequent in-person discussion, the human resources manager pointed to two clauses in Ms. Li's employment contract. One briefly mentions early expiration of the contract if the "[e]mployee reaches retirement age as regulated by China law and regulations"; the other states that the "retirement age and retirement related matters of the Employee will be

7

applicable to PRC Laws and Regulations." (Section 8, Articles 1(b) and 10.) In that meeting, Ms. Li informed Defendant that the Chinese mandatory retirement age did not apply to her as a foreign worker.

27. Ms. Li's prior employment contract did not include any clause relating to forced retirement. She understood her second contract as a simple renewal and duplicate of the first contract. This understanding was supported by the contract's conspicuously underlined end date of December 31, 2024, the contract's boilerplate language, and Defendant's affidavit confirming the December 31, 2024 contract end date to China's regulatory authority when renewing Ms. Li's Class A Work Permit.

28. During this call on September 30, 2024, Defendant offered Ms. Li a new contract for a year-to-year consultant's role, but with terms that significantly reduced her overall compensation. For instance, Ms. Li normally received about 47% of her total compensation through annual bonuses and long-term incentive awards paid in February and March. Instead of matching those terms, the new contract had an end date that would preclude her eligibility for the bonus and incentive awards; cancelled executive severance provisions (nine months salary, per her original contract); and avoided paying Ms. Li her 2024 annual bonus. Overall, these changes would reduce her compensation by about half, despite her new expanded scope of responsibility. In addition, her year-to-year contract would have no precedent of renewal.

29. Put on the spot on September 30, Ms. Li was unable to sign a contract so financially damaging, particularly given her prior understanding that her existing contract extended until December 31, 2024.

30. On or about October 2, Ms. Li had her regular one-on-one meeting with Su Ping Lu. In this meeting, Ms. Li mentioned the human resources manager's communication to her and explained to Su Ping Lu that Defendant's decision to terminate her existing contract and replace it with a consulting agreement was not appropriate and not supported by Chinese law. Su Ping Lu asked Plaintiff to bring all her employment contract paperwork to the upcoming business trip for Lu to review and discuss in more detail during the trip.

31. On October 3, Ms. Li received a draft announcement, authored jointly by Global General Counsel Anne Madden and Su Ping Lu, to publicize Honeywell's new Asia initiative under Ms. Li's leadership; this was carefully reviewed and supported by the APAC President and other top executives.

32. On October 5, 2024, Ms. Li followed up with the human resources manager and Honeywell's legal counsel and provided them with Chinese legal cases proving the retirement age did not apply to her.

33. On October 7, Plaintiff embarked on a business trip scheduled from October 7-12, where she was to meet with business leaders across Asia specifically to discuss her newly expanded role and the new initiative, alongside Su Ping Lu. During the trip, Ms. Li was distressed about her employment status following the September 30 call with human resources.

34. During their meeting in Korea on October 7, 2024, which was the first stop of their week-long APAC trip, Plaintiff showed Lu the employment contracts, the offer letters, and the Chinese version of the Consulting Agreement, and a printed legal article by King & Wood Mallesons supporting her position (Ms. Li verbally translated the content). Ms. Li told Lu that based on legal precedent in China, Defendant would be in violation of the law and contract to force Ms. Li to retire. Lu reviewed these documents and said she would call U.S human resources to confirm that Ms. Li could remain at least through her December 31, 2024, contractual end date. On October 8, after landing in Malaysia from Korea, Lu told Ms. Li that she would contact U.S.-based leadership about Ms. Li's matter. The following morning on October 9, Lu and Ms. Li met over breakfast in the hotel, and Lu informed Ms. Li that the company would not change its position.

35. On October 9, 2024, Honeywell China's human resources department sent Ms. Li a termination notice. Ms. Li's trip was abruptly cut short, and she was terminated the next day, October 10, 2024.

36. Defendant denied Plaintiff her contractually owed severance. Despite acknowledging that Ms. Li was not terminated for any fault of hers, Defendant claimed the termination was for "Cause" due to the (illegal) provision within the employment contract / offer letter which stated

9

reaching retirement age constituted cause for nonpayment of severance. This classification of forced termination as for "Cause" contradicted Defendant's own equity policies; Defendant's Stock Incentive Plan Article 4.3(c) classifies retirement terminations as "involuntary termination[s] without cause."

### C. Ms. Li's Employment Contract Should Have Been Renewed on or Before December 31, 2024.

37. Defendant's own policies and practices supported the intent that Plaintiff's contract would continue until December 31, 2024, and beyond.

38. Defendant's human resources department typically issues notices three months before an employee's retirement and begins related procedures one month prior. Here, neither the human resources department nor any supervisor communicated at all with Ms. Li regarding her purported retirement-related termination until *nine days* before the supposed termination date.

39. When executives prepare to retire while holding long-term stock incentives and U.S. options (as Ms. Li did), Defendant's established practice is to provide those executives with formal outlines of their stock sale and exercise period arrangements. In contrast, even when Ms. Li explicitly inquired about these arrangements on October 11, neither human resources nor the executive compensation team provided her with any details.

40. In classifying Ms. Li's granted but unexercised stock options, Defendant listed Ms. Li's departure as a "voluntary termination" with a highly limiting 30-day exercise period. This contradicts the company's Stock Incentive Plan Article 4.3(c), which classifies retirement terminations as "involuntary termination[s] without cause" with a one-year option exercise period.

41. Ms. Li worked in Shanghai under China's Class A work permit. There are no age limitations on foreign Class A work permit holders. Her work visa expiration dates matched with those of her employment contracts, and Defendant formally certified[1] to Chinese authorities that

---

[1] "The employer hereby declares that all the documents and information submitted to the authority are true, and shall be responsible for the authenticity of the documents and undertake corresponding legal responsibilities. The employer should give the consent to the authority's supplementary investigation as necessary." (Defendant's Application for Extension of Foreigner's Work Permit for Plaintiff dated around March 1, 2022)

10

Ms. Li's contract would extend at least until December 31, 2024.

42. Ms. Li's leadership of the China Steering Committee and her planned expansion to oversee Asia-wide compliance work provided compelling evidence of Honeywell's intention to retain her services beyond December 31, 2024. Following Honeywell's December 2022 Deferred Prosecution Agreement (DPA) with the U.S. Department of Justice for FCPA violations, Ms. Li was specifically tasked by Honeywell's Chief Compliance Officer to establish and lead a China Steering Committee to root out irregular business practices and improve compliance culture in China. The DOJ had endorsed a similar steering committee structure in Honeywell's India operations, and Ms. Li was asked to replicate this successful model for China. From June 2023 to September 2024, Ms. Li successfully chaired six quarterly report-out meetings to U.S. executive leaders, including the General Counsel, CFO, Chief Compliance Officer, and Chief Auditor, receiving consistent high praise for her work.

43. Given her exceptional track record and the critical nature of compliance work under the three-year DPA (which extends until December 2025), in September 2024, Ms. Li's supervisor expanded her focus to cover the rest of Asia outside of China, where several countries had similar business irregularities requiring her expertise. This expansion was formalized through a draft organizational announcement prepared by Honeywell's General Counsel and reviewed by the APAC President, culminating in Ms. Li's October 2024 business trip to meet with leaders across Asia to discuss her expanded role. Based on this significant expansion of responsibilities and the critical ongoing compliance work, Honeywell clearly conveyed the intent that Ms. Li's contract would be renewed when it expired on December 31, 2024.

44. As discussed above, Defendant's expansion of Ms. Li's role and the elevation of her responsibilities in the month (and even week) preceding her termination demonstrate that there was no legitimate business justification for the termination.

45. The company's failure to follow its own retirement procedures and elevation of Ms. Li's role in the days preceding her termination indicate it was both parties' understanding that Ms. Li's employment would continue for the foreseeable future, certainly until December 31, 2024,

and beyond.

46. Plaintiff was also subjected to unlawful disparate treatment based on race, ancestry, and ethnicity. For instance, Gerard Willis, an American citizen of non-Asian ethnicity who worked as APAC General Counsel until approximately 2017-2018, was not subjected to Chinese mandatory retirement laws despite reaching the age of 60 and working in China in a similar capacity to Plaintiff. In comparison, despite being an *American citizen* with *identical citizenship* status to Willis, Plaintiff was purportedly subjected to Chinese mandatory retirement restrictions with only nine days' notice, receiving substantially inferior treatment as compared to a non-Asian American citizen.

47. On March 27, 2025, Counsel on behalf of Ms. Li filed a charge with the Equal Employment Opportunity Commission's ("EEOC") Charlotte, North Carolina branch regarding these events and requested a Notice of Right to Sue under the Age Discrimination in Employment Act ("ADEA"). **Exhibit A**. The charge was assigned the number 430-2025-02291. On May 6, 2025, the EEOC issued the Right to Sue Notice. **Exhibit B**.

## LEGAL CLAIMS
## FIRST CAUSE OF ACTION
**(Wrongful Termination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621)**

48. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

49. The ADEA prohibits age discrimination in employment and applies to "any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country." 29 U.S.C. § 630(f). Ms. Li is therefore protected by the ADEA as an American citizen employed by an American company or entity controlled by an American company in China.

50. Under the ADEA, a plaintiff "can establish a *prima facie* case of disparate treatment by demonstrating that [s]he was (1) at least forty years old, (2) performing [her] job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise 'giving rise to an inference of age discrimination.'" *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

51. Ms. Li can clearly prove all elements of an age discrimination claim: (1) she was 55 years old at the time of the adverse action; (2) her job performance was exemplary, with no complaints; (3) she was terminated from her position; and (4) she was terminated solely because of her age. Indeed, there is no need to find an "inference" of age discrimination; Defendant explicitly named it as the sole, but-for reason for Ms. Li's termination.

52. Defendant pointed to the clauses in Ms. Li's contract which purportedly allowed her termination: that the contract "shall expire" if the "[e]mployee reaches retirement age as regulated by China law and regulations" and that the "retirement age and retirement related matters of the Employee will be applicable to PRC Laws and Regulations" (Section 8, Articles 1(b) and 10). These clauses blatantly violate the ADEA's prohibition on terminating an employee solely due to age.

53. The ADEA includes a 'foreign laws' exception, which does not apply in this case. Employers may violate the ADEA where compliance would cause the employer to violate the laws of the country in which the workplace is located. The employer must show that the country's laws do not allow for reassignment, exemptions, etc., but instead absolutely force a termination. *Mahoney v. RFE/RL, Inc.*, 47 F.3d 447, 449 (D.C. Cir. 1995). Here, China's mandatory retirement age of 55 did not dictate Ms. Li's termination for the following reasons, among others: Ms. Li was subject to a Class A work permit, which explicitly does not subject foreign holders to any age restrictions; *China's retirement age is not mandatory for foreign workers*, particularly in Shanghai, where Ms. Li worked; and many alternate solutions were possible to avoid termination, including reassignment to another country or offering a multi-year contractor position that matched (or came close to matching) the financial package of Ms. Li's employment contract. *See Wang v. Gen. Motors, LLC*, 371 F. Supp. 3d 407, 420 (E.D. Mich. 2019).

54. Even if the relevant contract clauses were legal, Defendant misapplied them and wrongfully terminated Ms. Li in violation of the ADEA. The clauses state the employee's retirement issues will be dictated by China law, but China law does not require the application of the retirement age to foreign workers. The clauses themselves violate the ADEA by discriminating

13

explicitly on the basis of age, and the clauses as interpreted by Defendant also violate the ADEA as Defendant purportedly relied on an interpretation of Chinese law that is blatantly wrong.

55. As a direct, foreseeable, and proximate result of Defendant's unlawful actions terminating Ms. Li with only nine days' notice, Ms. Li has suffered substantial losses in earnings and other employment benefits, including her 2024 annual bonus, and has incurred other economic losses.

56. Defendant committed the acts herein willfully, despicably, maliciously, fraudulently, and oppressively, and in conscious disregard of Ms. Li's rights. Ms. Li is entitled to liquidated damages.

## SECOND CAUSE OF ACTION
**(Wrongful Denial of Severance Pay in Violation
of the Age Discrimination in Employment Act, 29 U.S.C. § 621)**

57. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

58. Under the ADEA, it is illegal to discriminate on the basis of age in the terms and conditions of employment. A plaintiff "can establish a prima facie case of disparate treatment by demonstrating that [s]he was (1) at least forty years old, (2) performing [her] job satisfactorily, (3) discharged [or suffered another adverse employment action], and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged [or suffered another adverse employment action] under circumstances otherwise 'giving rise to an inference of age discrimination.'" *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

59. Defendant wrongfully denied Ms. Li severance pay in violation of the ADEA, an adverse employment action. Though acknowledging Ms. Li was not terminated for any fault of hers, Defendant claimed the termination was for "Cause" due to the illegal provision within the employment contract which stated that reaching retirement age constituted cause for nonpayment of severance.

60. This classification of forced termination as for "Cause" contradicted Defendant's own

equity policies; Defendant's Stock Incentive Plan Article 4.3(c) classifies retirement terminations as "involuntary termination[s] without cause."

61. Ms. Li can therefore clearly prove a prima facie case of age discrimination due to the wrongful denial of severance: (1) she was 55 years old at the time of the adverse action; (2) her job performance was exemplary, with no complaints; (3) she was denied severance (a benefit of employment); and (4) she was denied severance solely because of her age. Indeed, there is no need to find an "inference" of age discrimination; Defendant explicitly named it as the sole, but-for reason for Ms. Li's loss of severance.

62. As a direct, foreseeable, and proximate result of Defendant's unlawful action terminating Ms. Li with only nine days' notice, Ms. Li has suffered substantial losses in earnings and other employment benefits, including her 2024 annual bonus, and has incurred other economic losses.

63. Defendant committed the acts herein willfully, despicably, maliciously, fraudulently, and oppressively, and in conscious disregard of Ms. Li's rights. Ms. Li is entitled to liquidated damages.

## THIRD CAUSE OF ACTION
### (Violation of 42 U.S.C. § 1981 – Race Ancestry Discrimination in Contract Enforcement)

64. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

65. Section 1981 of the Civil Rights Act (42 U.S.C. § 1981) prohibits discrimination based on race, ancestry, and ethnicity in the making, performance, modification, and termination of contracts, including employment contracts.

66. Plaintiff is a member of a protected class under Section 1981 based on her Chinese ancestry and ethnicity.

67. Defendant discriminated against Plaintiff in the enforcement and termination of her employment contract based on her Chinese ancestry and ethnicity.

68. Defendant's discrimination is evidenced by its differential treatment of similarly

situated employees based on race, ancestry, and ethnicity. For instance, Gerard Willis, an American citizen of non-Asian ethnicity who worked as APAC General Counsel until approximately 2017-2018, was not subjected to Chinese mandatory retirement laws despite reaching the age of 60 and working in China in a similar capacity to Plaintiff. In comparison, despite being an *American citizen* with *identical citizenship* status to Willis, Plaintiff was subjected to Chinese mandatory retirement law with only nine days' notice, receiving substantially inferior treatment as compared to a non-Asian American citizen.

69. Defendant's application of Chinese retirement law to Plaintiff, while exempting similarly situated American employees of non-Asian ethnicity, demonstrates intentional discrimination based on Plaintiff's Chinese ancestry and ethnicity.

70. Defendant's actions in subjecting Plaintiff to Chinese retirement law were based on racial and ethnic stereotyping, treating Plaintiff as if she were subject to Chinese law because of her Chinese ancestry rather than recognizing her actual legal status as an American citizen foreign worker exempt from Chinese retirement requirements.

71. Defendant's misapplication of Chinese retirement law to Plaintiff constituted interference with her contractual rights based on her race, ancestry, and ethnicity, in violation of Section 1981.

72. Defendant's conduct was intentional, willful, and undertaken with malicious disregard for Plaintiff's rights under Section 1981.

73. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered damages including lost wages, lost employment benefits, emotional distress, reputational harm, and other economic and non-economic losses.

74. Defendant's conduct was undertaken with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

75. Plaintiff is entitled to recover her reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

# FOURTH CAUSE OF ACTION

**(Wrongful Discharge in Violation of the Public Policy of North Carolina (N.C. Gen. Stat. § 143-422.1 et seq.))**

76. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

77. North Carolina's public policy, as expressed in the North Carolina Equal Employment Practices Act (N.C. Gen. Stat. § 143-422.1 et seq.), prohibits employers from discriminating against any person on the basis of that person's age and/or race. Terminating an employee because of age and/or race contravenes this clear public policy.

78. By terminating Plaintiff's employment solely because she reached age 55, and/or because of her race, Defendant violated the well-established public policy of North Carolina. Accordingly, Plaintiff's discharge was wrongful and unlawful under North Carolina law.

79. As a direct and proximate result of Defendant's wrongful discharge of Plaintiff, Plaintiff has suffered damages including lost wages, lost employment benefits, and other economic loss, as well as emotional distress and other non-economic harm, in an amount to be determined at trial.

80. Defendant Honeywell's officers, directors, or managers participated in or condoned the conduct constituting aggravating factors giving rise to punitive damages under state law. Defendant's conduct was willful and undertaken with wanton and reckless disregard for Plaintiff's protected rights. Accordingly, Plaintiff is entitled to recover punitive damages under North Carolina law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ji Li prays for judgment and the following specific relief against Defendant Honeywell International, Inc. as follows:

1. For compensatory damages for front pay, back pay and lost benefits, including any equity and bonus loss;

2. For compensatory damages for Plaintiff's emotional distress;

3. For liquidated damages under the ADEA;

17

4.  For statutory attorneys' fees and costs;

5.  For statutory penalties and punitive damages under state law;

6.  For prejudgment interest and post-judgment interest as allowed by law; and

7.  For an award of such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all causes of action and/or issues so triable.

This the 30th day of July, 2025.

*/s/ Jenny L. Sharpe*
Jenny L. Sharpe
Attorney for Plaintiff
N.C. State Bar No. 13698

**J SHARPE, PLLC**
15720 Brixham Hill Avenue,
Suite 300
Charlotte, NC  28277
Telephone: (704) 944-3272
Facsimile: (704) 944-3201
Email: sharpeattorney@gmail.com


*/s/ David A. Lowe*
David A. Lowe
Attorney for Plaintiff
CA State Bar No. 178811
(*pro hac vice* application pending)
Jessica P. Spierer
CA State Bar No. 348093
(*pro hac vice* application pending)

**Rudy, Exelrod, Zieff & Lowe, LLP**
351 California Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 434-9800
Facsimile: (415) 434-0513
Emails: dal@rezlaw.com; jps@rezlaw.com